1
2
3
4
5
6
7
8      **UNITED STATES DISTRICT COURT**
9      **CENTRAL DISTRICT OF CALIFORNIA**
10

11  KST DATA, INC.,                          ) Case No. CV 17-5125-MWF (PJWx)
12                         Plaintiff,         ) **FINDINGS OF FACT AND**
                                             ) **CONCLUSIONS OF LAW**
13          v.                               )
14                                           )
15  NORTHROP GRUMMAN SYSTEMS                  )
    CORPORATION,                             )
16                         Defendant.         )
17                                           )
18                                           )
19  _____  )

20          This matter came on for trial before the Court sitting without a jury on September 3,
21  2019.  Gary S. Lincenberg, Esq., Nicole Rodriguez Van Dyk, Esq., Ashley D. Bowman,
22  Esq., and Jonathan M. Jackson, Esq., of Bird Marella, Boxer, Wolpert, Nessim, Drooks,
23  Lincenberg, Rhow, P.C., appeared on behalf of the Plaintiff KST Data, Inc. ("KST").
24  Christopher T. Casamassima, Esq., Andrew E. Shipley, Esq., and Souvik Saha, Esq., of
25  Wilmer Hale LLP, appeared on behalf of Defendant Northrop Grumman Systems
26  Corporation ("Northrop").
27          Mr. Lincenberg and Mr. Casamassima gave opening statements.  The following
28  witnesses were called and examined by the parties in the order recited below:

On the same day, following opening statements, Ms. Van Dyk began to examine **Armando Tan**, KST's corporate representative and Vice President of Operations.  That examination continued on September 4, 2019.  Mr. Casamassima then cross-examined Mr. Tan.  Ms. Van Dyk began to conduct her redirect examination, which continued on September 5, 2019.

Mr. Jackson, appearing for KST, examined **Mark Edson**, Vice President of Sales for KST.  Mr. Casamassima then cross-examined Mr. Edson.

KST admitted the testimony of **Johnny Archer** via declaration.  Mr. Casamassima then cross-examined Mr. Archer.  Ms. Bowman conducted a redirect examination.

Mr. Lincenberg and Ms. Bowman read from the deposition transcript of **Ken Brown**, Northrop's director of supply chain.

Plaintiff then rested.

Northrop played the video deposition testimony of **Jeff Ferguson**.  That examination continued on September 6, 2019.

Mr. Saha examined **John Jordan**, the global supply chain director for the missile defense and protective systems division.  Ms. Van Dyk then cross-examined Mr. Jordan.

Next, Mr. Casamassima and Mr. Saha read from the deposition transcript of **Eugene Jacobwitz**, the general manager of KST.  That reading continued on September 10, 2019.

Mr. Casamassima and Mr. Saha read from the deposition of **Mr. Edson**.

Mr. Saha examined **Gary Fourney**, the director of the supply chain for the global logistics and modernization division at Northrop.  Mr. Lincenberg then cross-examined Mr. Fourney.  Mr. Saha then conducted a redirect examination.

Mr. Casamassima examined **Mr. Brown** in court, the corporate director of the supply chain for Northrop.  Mr. Lincenberg then cross-examined Mr. Brown.  The cross-examination continued on September 11, 2019.  Mr. Casamassima conducted a redirect examination, and Mr. Lincenberg then conducted a recross-examination.

///

-2-

On September 13, 2019, Ms Van Dyk made a closing argument on behalf of KST and Mr. Casamassima made a closing argument on behalf of Northrop.  Ms. Van Dyk also made a rebuttal argument on behalf of KST.

Following the presentation of evidence and the parties' closing arguments, the matter was taken under submission.

Having carefully reviewed the record and the arguments of the parties, as presented at the hearing and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

Based on these findings of fact and conclusions of law, the Court returns a verdict in favor of KST and awards damages.

## I.     FINDINGS OF FACT

### A.     The Parties

1.     Plaintiff KST filed this action for breach of contract and breach of implied covenant of good faith and fair dealing.

2.     KST is a California corporation, with its principal place of business in Los Angeles, California.  KST provides technology products and services to a range of private and government clients, including Northrop.

3.     Northrop is a Delaware corporation, which operates facilities in locations across the country, including in Redondo Beach, California.  Northrop is a global security company that provides systems, products, and solutions to the United States Government as well as other government and commercial customers worldwide.

### B.     The Witness Testimony

#### a.     *Armando Tan*

4.     On direct examination, Mr. Tan generally discussed KST's relationship with Northrop, along with various provisions of Corporate Award #3263 (the "Corporate

Award").  The thrust of Mr. Tan's testimony was that KST and Northrop had a good business relationship prior to and during the performance of the Corporate Award, that KST was responsible for procuring certain equipment for Northrop prior to it actually being ordered by Northrop, and that KST was seeking financial protection for procuring that equipment.

5.     Mr. Tan also discussed on direct the circumstances around the National Aeronautics and Space Administration ("NASA") suspension of KST from contracting with the United States Government (the "Suspension") due to allegations of serious misconduct, and the extent of KST's communications with Northrop regarding the Suspension.  The thrust of Mr. Tan's direct testimony on this topic was that while the Suspension was serious, it only applied to government contracts (and therefore not the Corporate Award), and that KST was forthright with Northrop regarding the Suspension.

6.     Mr. Tan further discussed KST's relationship with SYNNEX Corporation ("Synex"), and Northrop's knowledge of that relationship.  Specifically, Mr. Tan testified that Northrop employees toured Synnex facilities with KST, and understood their relationship.

7.     Mr. Tan further testified on direct regarding Northrop's ceasing of orders from KST pursuant to the Corporate Award after the Suspension, and how KST was receiving mixed messages from Northrop regarding whether Northrop would resume ordering from KST at any point.  Finally, Mr. Tan testified regarding the amount of inventory KST was holding that KST believed it should be compensated for as a result of Northrop's alleged breach of the Corporate Award.  Relatedly, Mr. Tan testified regarding KST's efforts to mitigate its damages by selling its inventory to Big Blue.

8.     During his cross-examination, Mr. Tan conceded that there were certain details about the Suspension that KST did not share with Northrop, including the specific allegations in the NASA Acquisition Integrity Program (AIP) Action Referral Memorandum ("ARM").  That was because KST did not actually share the ARM with Northrop.   Additionally, during his cross-examination, Mr. Tan acknowledged that he had

been arrested and his role changed as a result of his arrest, as he could no longer supervise or work on certain government contracts.

9.     Additionally, during the cross-examination, Mr. Casamassima attempted to cast doubt on Mr. Tan's previous testimony regarding KST's damages, attacking both whether the inventory in question was ever forecasted by Northrop and the price of the inventory in question.  Additionally, during cross-examination, Mr. Tan admitted that the inventory for which KST sought damages was held by Synnex, and that the damages stemmed from KST's agreement to purchase the inventory from Synnex.

10.    Finally, during cross-examination Mr. Tan admitted that some employees of Northrop did not seem to be aware of Synnex's relationship with KST.

### b.   *Mark Edson*

11.    On direct examination, Mr. Edson echoed Mr. Tan's testimony regarding the Corporate Award, and specifically the importance of KST being protected against acquiring inventory Northrop later decided it did not need.  Mr. Edson also testified regarding KST's relationship with Synnex, and Northrop's knowledge of that relationship.

12.    Finally, Mr. Edson testified further regarding KST's discussion of the Suspension with Northrop.  Specifically, he described a call he was on (which KST had suggested) where KST described the Suspension to Northrop, along with thinking that Northrop would resume ordering from KST once the Suspension was lifted.

13.    During the cross-examination, Mr. Edson testified regarding KST's mention of Synnex in its discovery responses.  Additionally, Mr. Edson testified further about KST's conversations with Northrop relating to the Suspension, specifically that KST never informed Northrop that its offices were searched, or the criminal investigation.

### c.   *Johnny Archer*

14.    During cross-examination, Mr. Archer admitted that mention of Synnex was removed from documents sent to Northrop, and there were internal communications with KST instructing the same.

///

15.     During his redirect examination, Mr. Archer testified regarding forecasts from Northrop and KST's relationship with Synnex, including Northrop's knowledge of the same.

### d.     *Ken Brown*

16.     During the reading of his deposition transcript, Mr. Brown testified regarding the process Northrop has in place to suspend or block a contractor, and noted that KST was never officially suspended or blocked in Northrop's internal system.  Instead, Northrop officials were instructed, based on guidance from legal, to stop placing orders with KST until further notice.  Mr. Brown did not testify further as to what that exact guidance from legal was, nor the basis for that guidance, citing the attorney-client privilege.  Mr. Brown repeatedly referred to it as putting KST on "pause."

17.     Mr. Brown further testified (via deposition) that KST performed under the contract, and that the Suspension had no technical impact on the Corporate Award, considering that the Suspension only applied to government contracts.  Mr. Brown also testified regarding the internal discussions at Northrop, in which numerous Northrop employees expressed a desire to continue ordering from KST.  Mr. Brown also testified regarding Northrop's knowledge with respect to the inventory KST was holding for Northrop in the fourth quarter of 2015, and indicated that Northrop had at least some awareness regarding that inventory.

18.     Finally, Mr. Brown testified (during deposition) regarding the conversations between KST and Northrop regarding resuming orders.  Specifically, Mr. Brown testified that it was false to say he was "pursuing" options to get KST all clear, and he did not know why anyone told that to Mr. Tan.

19.     When he was examined in court, Mr. Brown discussed the Corporate Award in some detail.  He also testified regarding Northrop's knowledge of Synnex, and while he was not surprised that KST needed Synnex's help in staging and warehousing, that is very different than Synnex directly purchasing the inventory from HP and subcontracting.  He would be concerned about Synnex undertaking such a role because of costs and security.

20.     He also testified that he had been involved with the termination of suppliers a couple of times, and KST was not terminated.  Instead, KST was put on "pause" while Northrop tried to figure out what was happening with the Suspension.  The business side did not want to move away from KST, but Northrop's counsel was worried.  He also testified that Northrop purchased the inventory from Future Tech Enterprises, Inc. ("Future Tech") because it was a "crucial" time for Northrop and while it wanted KST to become re-established, Northrop could not wait any longer.

21.     Mr. Brown further testified that he was "shocked" when he received a letter from KST regarding termination because he did not think there was a termination.  He also did not understand why KST could not have sold the inventory easily to someone else, because he had heard from Hewlett-Packard ("HP") that the inventory was not designed specifically for Northrop.

22.     During his in-court cross-examination, Mr. Brown continued to discuss the Corporate Award.  Mr. Brown also conceded that there is no language in the Corporate Award that KST must purchase from HP directly, but Mr. Brown said that was the "intent."  He also conceded that KST only needed to have title at the time of delivery, and not prior.  He also conceded that he was aware of some concern at KST regarding holding the inventory for forecasted items prior to signing the Corporate Award.  He also said prior to October 2015 he was not aware of any instances when Northrop failed to purchase forecasted inventory.  And he testified that as of November 2018, he was not aware of any material breaches of the Corporate Award by KST.

23.     He also testified that he was not aware whether there was a legal bar from Northrop purchasing from KST during the Suspension.  But, he conceded that starting in October 2015, Northrop was internally barred from purchasing from KST under the Corporate Award, and never purchased again after the Suspension.  Mr. Brown also conceded that he is not aware of any evidence disputing that Northrop employees visited Synnex.

///

24.     Finally, Mr. Brown conceded that Northrop gave KST mixed messages regarding ordering the inventory even after it had acquired replacement inventory from Future Tech.

### e.     *Jeff Ferguson*

25.     During his video deposition testimony, Mr. Ferguson testified regarding KST's relationship with Synnex, and his lack of knowledge of that relationship.  He also testified that it surprised him that KST forwarded the Northrop forecast to anyone, because it was very important to Northrop that as few parties were involved in the Corporate Award as possible, as the supply chain was very important.  Accordingly, he was very surprised to learn Synnex was KST's subcontractor.

26.     Mr. Ferguson further testified (via deposition) that he was never told why Northrop stopped ordering from KST, and while Northrop eventually purchased the equipment at issue from Future Tech, that was not his preference, and he would have preferred to purchase the equipment from KST.

### f.     *John Jordan*

27.     His main topic of testimony was KST's Suspension, and how it impacted Northrop.  Specifically, he testified that issues like suspensions and disbarment are "significant" and are disruptive, and they come with reputational risks as well, so Northrop just wanted to find out what happened.  Accordingly, Northrop wanted to review certain materials and wanted to find out the facts of what happened (including the basis for the Suspension, what they were doing to address it, and how long it would last).  Northrop wanted to hear KST out, but Northrop had doubts.  KST told Northrop that it was hoping to lift the suspension in 30-60 days, and did not provide the ARM to Northrop because it "lacked specificity."  Also, KST claimed it had done nothing wrong.

28.     Mr. Jordan further testified on direct that Northrop did not continue placing orders with KST even after the Suspension lifted because Northrop was concerned that KST was not truly forthcoming with Northrop about the Suspension, specifically by not providing the ARM and not discussing the related criminal investigation.  Mr. Jordan

further noted that the ARM was very specific, making KST's statement that it lacked specificity appear untrue.  Finally, Mr. Jordan testified regarding his investigation into the relationship between KST and an entity known as DME, which also was part of the Suspension and criminal investigation.

29.     During his cross-examination, Mr. Jordan confirmed that KST gave Northrop access to its lawyers to discuss the Suspension, who also spoke to each other regarding the relationship between KST and DME.  He also testified that it was "interesting" to learn that the allegations in the ARM were not substantiated.  Finally, he confirmed that the automatic block in Northrop's system for KST remained in place after the Suspension was lifted.

### g.     *Eugene Jacobwitz*

30.     Mr. Jacobwitz generally discussed the relationship between KST and Synnex, and KST's communications to Northrop regarding the Suspension.

### h.     *Gary Fourney*

31.     Mr. Fourney testified that he had no issues with KST until October 2015, when he found out about the Suspension.  He also noted that Northrop did not find out from KST, which left a bad taste in his mouth.  He also testified he could count on "one hand" the number of suppliers who had been suspended.  He testified that he received guidance that he could keep using KST for already contracted orders, but that Northrop should not place any new orders.  That being said, he testified that it was always his intention to keep going with KST as soon as everything was resolved.  He further testified that he tried to slow roll ordering the replacement inventory to give KST a chance to resolve its issues.

32.     Mr. Fourney also testified regarding KST's inventory, and whether Northrop was going to try to compensate KST for that inventory.  He recalled wanting to help KST liquidate its inventory, but that Northrop was not liable.

33.     During his cross examination, Mr. Fourney testified further regarding his desire to order from KST even after the Suspension, when Northrop had knowledge of

-9-

KST's Suspension, and KST's inventory.  Specifically, Mr. Fourney conceded that while he did not hear of KST's Suspension from KST, lawyers for Northrop were told by KST lawyers.

34.   Based on the testimony of these witnesses and its review of the exhibits, the Court **FINDS** as follows:

**C.   The Corporate Award – Terms and Definitions**

35.   In August 2010, KST and Northrop entered into the Corporate Award, effective August 1, 2010.  (Ex. 17).  The Corporate Award was a written contract pursuant to which KST agreed to sell Northrop certain computers and computer related-products and services for Northrop's internal use.  (*Id*.).  The Corporate Award was not a government contract.  (*Id*.).

36.   The Corporate Award's effective date was subsequently extended through July 31, 2016, at which point it expired per its express terms.

37.   Because there is a dispute with respect to the intent of the parties to the Corporate Award based on the extrinsic evidence presented to the Court, the Court will make factual findings regarding the contract pursuant to California law.  (*See* Conclusion of Law No. 6).

38.   The Corporate Award enabled all elements of Northrop to purchase KST's products and related services at the prices and subject to the terms and conditions of the Corporate Award for Northrop's internal equipment needs.

39.   The Corporate Award explicitly incorporated Exhibit A, the Desktop Solution Program ("DSP") Statement of Work (the "SOW"), setting forth KST's obligations for hardware purchase, preparation, and delivery under the Corporate Award.  (Ex. 30).

40.   Under Section 32 of the Corporate Award, KST is not permitted to subcontract a part of the Award without Northrop's prior written approval.  (Ex. 17).

41.   Section 16.2 of the Corporate Award required KST to have title to all product offered for sale to Northrop.  (*Id*.).

42.    Section 16.5 of the Corporate Award required KST to comply with all applicable federal, state, and local laws, rules, and regulations and ordinances in the performance of the Corporate Award.  (*Id*.).

43.    Section 2.2 of the Corporate Award required Northrop to permit its operating elements to purchase products and services from KST pursuant to the terms of the Award.  (*Id*.).

44.    Amendments 20 and 23 to the Corporate Award sets forth the pricing applicable to the inventory in dispute in this action.  (*Id*.).

45.    Section 3.1 of the Corporate Award provides that Northrop was to issue forecasts to KST.  (Ex. 17).  These forecasts were to be provided by Northrop on a quarterly basis, and were to represent Northrop's "good-faith estimate of its projected purchasing requirements" for the ensuing twelve months, based on the information available to Northrop at the time of the forecast.  (*Id*.).

46.     Section 3.1 of the Corporate Award also expressly provides that KST was to use Northrop's forecasts for KST's "internal planning requirements."  (*Id*.).  Section 3.1 further states that Northrop had "no obligation to purchase the number of units set forth in the Forecast or place an order for any minimum dollar amount or quantity of Products and/or Services with [KST] during the term" of the Corporate Award.  (*Id*.).

47.    Additionally, Pursuant to Section 1.2 of the Corporate Award, the term "forecast" is defined as a "non-binding written forecast" of Northrop's "expected purchase requirements" for KST's products and services.  (*Id*.).

48.    Section 4(A)(1) of the DSP SOW required KST to maintain, at all times, inventory equal to the amount of products in Northrop's quarterly forecast, plus an additional 25%.  (Ex. 30).  Armando Tan testified to the same.

49.    KST was thus required to stock 125% of the inventory included in Northrop's most recent quarterly forecast, and to purchase and stage this inventory prior to the issuance of any purchase order by Northrop.

///

50.     Northrop required KST to maintain this inventory in part so that KST could deliver products, many of which were customized to Northrop's specifications and typically required eight weeks to manufacture and ship from OEMs, within days of receiving a purchase order from Northrop.

51.     Northrop was aware that KST ordered inventory based on Northrop's product forecasts.  Moreover, Northrop requested and received from KST regular updates on the status of KST's inventory.

52.     Section 3.2 of the Corporate Award requires that "[a]ll purchases . . . shall be written, facsimile, or electronic Purchase Order," which the Corporate Award defines as "an order issued by any number of the Buyer Group for the purchase of Products from [KST] pursuant to this Award."  (Ex. 17).

53.     The parties do not dispute that the Corporate Award was a valid, binding contract between KST and Northrop.  Accordingly, the Court **FINDS** that the Corporate Award was a valid, binding contract.

### D.     <u>Termination Under the Corporate Award</u>

54.     The Corporate Award contains two termination provisions, Sections 6.3 and 6.4.  (*Id.*).  Section 6.3 of the Corporate Award permitted Northrop to terminate the contract for cause under certain conditions.  (*Id.*).  Northrop does not suggest or argue it terminated the Corporate Award for cause under Section 6.3, or had cause to do so.

55.     Section 6.4 of the Corporate Award permitted Northrop to terminate the contract "in whole or in part . . . at any time and for any reason" if Northrop (1) gave written notice of the termination to KST; and (2) compensated KST for any outstanding purchase orders plus up to 4,500 units that were part of Northrop's forecast.  (*Id.*).

56.     KST officials testified that KST specifically negotiated Section 6.4 of the Corporate award because, for the first time in the parties' business relationship, the DSP SOW contained an explicit requirement that KST must purchase and stock inventory based on Northrop's forecasts.

///

57.     Accordingly, in order to protect itself from being stuck with units that it had ordered in reliance on Northrop's forecasts, KST sought Section 6.4 as protection in the event that Northrop decided to terminate the Corporate Award before its expiration date. Communications between KST and Northrop, as well as testimony from KST officials, suggest the same.

58.     Mr. Brown testified that the terms of the Corporate Award, including Section 6.4, were negotiated over the course of roughly one year.

59.     While Northrop witnesses tried to downplay the importance of Section 6.4 to KST, Mr. Brown indicated he had some general awareness of KST's concerns with respect to procuring forecasted inventory.

60.     Accordingly, the Court **FINDS** that Section 6.4 was specifically included in the Corporate Award to protect KST from being financially liable for forecasted inventory which was not ordered by Northrop in the event of a termination for convenience.

### E.     <u>Performance Under the Corporate Award</u>

61.     From 2010 through approximately September 2015, the parties performed under the Corporate Award.  Northrop issued quarterly forecasts, the parties participated in weekly calls regarding those forecasts, and KST purchased products and maintained inventory based on those forecasts.  Northrop then issued purchase orders for the previously forecasted units, KST delivered products under those purchase orders, and Northrop paid for those products under the Corporate Award's pricing schedule, as amended from time to time.

62.     At his deposition and at trial, Mr. Brown testified that KST did not fail to perform any material term of the Corporate Award.

63.     Northrop continued to issue forecasts pursuant to the Corporate Award through September 2015, and Northrop's forecast for Q4 of 2015 was approximately 3500 units.  Based on that forecast, KST ordered the corresponding products as required through Synnex, which purchased the forecasted products from the manufacturer, HP. ///

64.     At that time, KST became financially and contractually committed to purchase the products from Synnex.  Mr. Tan testified that Northrop had never failed to purchase all of the forecasted inventory prior to Fall 2015.

65.     The Court **FINDS** that KST performed all of its material obligations under the Corporate Award.  Specifically, the Court determines that KST was supplying computer units to Northrop pursuant to the Corporate Award for many years prior to the Suspension, and did not materially breach the Corporate Award.

66.     Northrop presented evidence and argument that KST failed to perform the Corporate Award based on KST's use of Synnex.  Specifically, Northrop argued that KST failed to perform under the Corporate Award because Synnex held title to the inventory at issue, which violated the Corporate Award's ban on subcontracting.  KST rebutted that argument with evidence that Northrop was aware, at least to some extent, of KST's relationship with Synnex.

67.     The Court **FINDS** that KST was not entirely forthright about its relationship with Synnex to Northrop, and that KST used Synnex for more than just warehousing.

68.     However, pursuant to Legal Conclusion Nos. 2-3, the Court **FINDS** that KST's use of Synnex was a non-material breach of the Corporate Award rather than material non-performance.  The purpose of the Corporate Award was for KST to supply inventory to Northrop, which KST consistently did.  Additionally, there was ample testimony and evidence that Northrop was familiar with KST's use of Synnex in some capacity, at least as a warehouser, but still accepted KST's inventory.  Northrop failed to establish that even if KST was using Synnex as more than a warehouser, and even if Synnex held title to the inventory prior to it being transferred to Northrop, that this was a material breach of the Corporate Award.

69.     Northrop did produce evidence and testimony that it was important to Northrop that few companies dealt with the inventory prior to Northrop receiving it, due to national security concerns, among other issues.  However, Northrop did not establish

that this rose to the level of a material breach.  Accordingly, KST performed under the Corporate Award.

### F. NASA Suspension and DOJ Criminal Investigation of KST

70.     On or around September 30, 2015, the National Aeronautics and Space Administration ("NASA") suspended KST from contracting with the United States Government (the "Suspension") due to allegations of serious misconduct.  (Ex. 509).

71.     Multiple KST witnesses testified that the Suspension only applied to KST's contract with government entities, and did not violate any terms of the Corporate Award or otherwise impact KST's or Northrop's rights, obligations, or performances under the Corporate Award.

72.     According to Mr. Tan's testimony, KST informed Northrop about its Suspension on or around October 6, 2015, and requested a meeting with Northrop.  (Exs. 151, 551).  Northrop agreed, but requested that KST provide a written summary of the issues underlying the Suspension in advance of the meeting, which was scheduled for and occurred on October 9, 2015.  (Ex. 141).

73.     In its written summary of the Suspension, and in its communications with Northrop during and after the October 9, 2015 meeting, KST misrepresented or omitted facts regarding the Suspension, including that KST's offices were searched.  (*Id*.).  KST further informed Northrop that it expected the Suspension to be lifted within 30-60 days.  (*Id*.).

74.     Upon learning of the Suspension, Mr. Jordan testified that Northrop entered KST into an internal tracking system, which prohibited all of Northrop's operating elements from purchasing any products from KST under the Corporate Award (or any other contract).  Mr. Tan testified that he believed it was reasonable for Northrop to be concerned that KST was being suspended from government procurement activities.

75.     On November 20, 2015, KST and NASA entered into an Interim Administrative Agreement ("IAA") to lift the Suspension.  (Ex. 518).  The IAA provided that NASA and KST both agreed that "adequate cause to suspend KST" existed "based

upon the facts as alleged in the NASA Acquisition Integrity Program (AIP) Action Referral Memorandum (ARM) dated September 30, 2015, which is incorporated into the Notice of Suspension." (Ex. 518).

76.     KST failed to provide Northrop with the ARM, and instead represented to Northrop that the ARM "lacked specificity" and the allegations therein did not appear related to KST. (Exs. 141, 511). Mr. Jordan testified to the same.

77.     Additionally, Mr. Jacobwitz testified via deposition testimony that it could be considered misleading if KST told Northrop it would let Northrop know if KST was never a target of a criminal investigation.

78.     The IAA expressly provided that "NASA [had] not determined that KST is presently responsible with regard to receiving any specific Federal Government contract, grant, or other non-procurement award." (Ex. 518).

79.     In its correspondence with Northrop, including in multiple letters between April 2016 and November 2016, KST repeatedly represented to Northrop that, vis-à-vis the IAA, KST had been "cleared" or deemed by the Federal Government to be a presently responsible contractor. (Ex. 237).

80.     Mr. Jacobwitz testified (via deposition) that KST may not have been truthful with Northrop about KST being "presently responsible" once the settlement had been lifted, as that representation seemed to be in conflict with the IAA.

81.     Accordingly, the Court **FINDS** that KST was not entirely forthright with Northrop regarding its Suspension.

82.     However, the Court further **FINDS** that the Suspension and KST's communications with Northrop in connection with the Suspension – or lack thereof – did not justify a Termination for Cause under Section 6.3 of the Corporate Award.

**G.     Northrop's Decision to "Pause" Placing Orders with KST**

83.     Because the Corporate Award was not a government contract, the Suspension did not preclude Northrop from continuing to place orders with KST under the Corporate Award. However, soon after learning about the Suspension, Northrop decided to pause

placing orders under the Corporate Award pending resolution of KST's Suspension.  Mr.
Brown testified that this decision came from Northrop's legal department, and many
inside Northrop wanted to keep ordering from KST.  (Ex. 184).

84.     Northrop also put together a presentation which provided that there was a
"low risk" from ordering from KST, but there was a "reputational" risk to consider as
well.  (*Id*.).

85.     Mr. Brown also testified that this decision was a "business decision" based
on legal guidance and advice, and Northrop was not precluded from using KST devices.

86.     As a result, by October 22, 2015, Northrop had made a "final decision" to
stop purchasing from KST (pending resolution of the Suspension) but did not inform KST
of that fact.  Mr. Brown confirmed this, as does Exhibit 147.

87.     Also in October 2015, Northrop decided to solicit a bid from another
supplier, Future Tech, for all of the units of computer equipment Northrop needed from its
latest forecasts to KST.  (Ex. 149).

88.     By early November 2015, Northrop had finalized a deal with Future Tech to
purchase all of the units at issue.  Northrop did not inform KST of that fact, but instead
continued to tell KST that it would resume purchasing once the Suspension had been
resolved.

89.     Northrop did not issue a Purchase Order for the inventory at issue in this
lawsuit, including during the period following the execution of the IAA to lift the
Suspension.  Instead, Northrop continued its "pause" in light of the ongoing criminal
investigation of KST conducted by the U.S. Department of Justice.

90.     In late 2015, Northrop's in-house counsel held several meetings to discuss
the situation with KST.  By December 2015, Northrop's lawyers had formulated a
"standard response" to any questions regarding KST and circulated that response to
Northrop's employees.  Northrop has claimed attorney-client privilege regarding the
contents of these meetings and the content of the "standard response."  (Ex. 170).
///

91.     In January 2016, Northrop again instructed its business units that they could no longer purchase any products from KST.  Northrop did not inform KST of that fact. Instead, Northrop instructed its employees to refrain from discussing the matter with KST, while it continued to tell KST that its status was under review internally.  (Ex. 149).

92.     Mr. Tan testified that during this time period, Northrop never indicated it would stop ordering after the Suspension was lifted, but instead said once the all clear was given, Northrop would resume purchasing.  This continued even after KST informed Northrop that the Suspension was lifted.  (Exs. 153, 157, 159, 160, 172).

93.     In fact, when Mr. Ferguson told Mr. Tan that Mr. Brown was "pursuing" getting KST "all clear" with Northrop, Mr. Brown later testified (via deposition) that the statement was not true, he was not pursuing any such thing, and did not know why Mr. Ferguson told Mr. Tan he was.  (Ex. 159).

94.     Throughout the time period between September 30, 2015 and July 31, 2016, Northrop remained hopeful that KST could resolve its legal issues with the Federal Government.  During this time period, Northrop's business units wanted to purchase products from KST, but did not.

95.     At no time prior to the Corporate Award's expiration on July 31, 2016 did Northrop explicitly invoke the Corporate Award's termination procedures.

96.     Northrop did not purchase any units from KST under the Corporate Award after KST was suspended.

### H.     Northrop's Breach of the Corporate Award

97.     As noted above, the Court **FINDS** that (1) there was a valid contract between KST and Northrop; and (2) KST performed under the Corporate Award.  Accordingly, the Court must determine whether Northrop breached the Corporate Award.

98.     KST argues that the failure of Northrop to either (1) continue ordering under the Corporate Award; or (2) follow the procedures of Section 6.4 constitutes a breach of the Corporate Award.  Northrop disagrees, arguing that it was entitled to put KST on "pause."  The Court **FINDS** that Northrop breached the Corporate Award by

(a) preventing its business units from purchasing any products from KST beginning in October 2015; and (b) failing to comply with Section 6.4 by not notifying KST in writing and not purchasing up to 4,500 units that were part of its forecast.

99.   Quite simply, the Corporate Award did not expressly cover KST's legal situation in the Fall of 2015 – where KST does not violate the law, but was under investigation for doing so, such that Northrop did not want to continue doing business with KST. Northrop may have wished, in hindsight, that such a situation would allow it to terminate the Corporate Award for cause, but that is not how the Corporate Award was written.

100.   Instead, the Corporate Award designated several scenarios (none of which apply here) when the Corporate Award could be terminated for cause, otherwise the Corporate Award had to be terminated for convenience, which subjected Northrop to Section 6.4's requirement of purchasing up to 4,500 units it forecasted.

101.   Northrop cleverly tried to avoid the requirements of Section 6.4 by arguing that there never was a termination, just a "pause." Of course, this argument would read Section 6.4 entirely out of the contract. Under this reading, Northrop would always choose to "pause" the Corporate Award and avoid paying KST for the forecasted units at any time and for any reason, and such a reading is not plausible in light of the extensive negotiation regarding Section 6.4 specifically, and Section 6.4's importance to KST.

102.   And despite Northrop's arguments that it intended to order from KST as soon as the Suspension was lifted, its actions suggest otherwise. For example, Northrop ordered replacement inventory from Future Tech in October or November of 2015, while still indicating to KST that it was trying to work out the situation such that Northrop could order from KST again.

///

///

///

///

I.     **The Disputed Inventory**

103.   On April 20, 2016, KST sent Northrop a letter invoking the Corporate Award's dispute resolution procedures.  (Ex. 181).

104.   The April 20, 2016 letter stated that, pursuant to Section 6.4 of the Corporate Award, Northrop terminated the Corporate Award for its convenience and was therefore required to pay for the equipment that KST had purchased based on Northrop's forecast. (*Id.*).

105.   In the same letter, however, KST acknowledged that it "has not received a notice that the Corporate Award had been terminated."  (*Id.*).

106.   On June 6, 2016, Northrop responded in writing informing KST that Northrop had made a business decision to purchase the units at issue from another supplier, and encouraged KST to sell the units in its inventory to a third party buyer in order to mitigate its damages.  (Ex. 229).

107.   In a subsequent letter dated July 28, 2016, Northrop reiterated that it no longer needed any of the units at issue because it had purchased them from another supplier, and affirmed that it would not negotiate with KST regarding the pricing discounts that KST had previously offered (both orally and in writing) regarding those units.  (Ex. 233).

108.   All of the inventory at issue was purchased from HP by Synnex.  At all times during the term of the Corporate Award, Synnex held the legal title to the at-issue inventory, prior to its delivery to Northrop.  Mr. Brown testified that it surprised him to learn that Synnex held title.

109.   However, Mr. Tan testified that Northrop was aware of Synnex, and even toured its facilities with KST officials.  And Mr. Brown testified that it was his understanding that KST had title at the time of delivery, not prior, and that title at the time of delivery was the only title he was concerned with.

110.   That being said, there was evidence that KST tried to hide Synnex's involvement in the Corporate Award from Northrop, including the fact that certain

spreadsheets had different Synnex PO numbers when sent to HP versus when sent to Northrop. (Exs. 598-601). There was also an email where KST was removing the "S" from serial numbers. (Ex. 603). Additionally, in February 2015, Mr. Ferguson wrote that he had "no knowledge" of Synnex. (Ex. 98).

111. However, Mr. Edson testified that he made no effort to hide KST's use of Synnex.

112. On February 28, 2017 – seven months after the Corporate Award's expiration – KST and Synnex entered into a Settlement and Release Agreement concerning the at-issue inventory ("Settlement Agreement"). (Ex. 244).

113. Per the Settlement Agreement, KST was required to issue two purchase orders, totaling $3,252,777.60 within sixty days for the inventory at issue. (Ex. 244). Mr. Tan testified that KST had already paid $2.1 million of this amount. (Exs. 256-58, 287).

114. The earliest evidence of KST's payment to Synnex – for a fraction of the at-issue inventory – is August 31, 2017.

115. Mr. Tan testified that in July 2017, KST sold 3,117 computers from the inventory at issue in this case to a company called Big Blue for $906,300. Mr. Tan testified that KST received other offers from other companies for less money, but declined them.

116. When the Corporate award expired on July 31, 2016, KST retained inventory of roughly 3,117 units that it had instructed its distributor, Synnex, to purchase in reliance on Northrop's forecasts. (Exs. 110, 210-213). This inventory is valued at $4,356,869 according to the operative pricing schedule in Amendments 20 and 23 to the Corporate Award. (Exs. 28, 304). This is consistent with KST officials' testimony.

117. Mr. Tan testified there were also storage fees associated with this inventory of roughly $60,000. (Exs. 222-228). Mr. Tan testified that KST also had to pay interest of more than $145,000.

118. However, it appears that only four checks were issued to Synnex from KST as of February 2018, totaling $1.66 million. (Exs. 260, 523).

119.   Based on the above, KST argues it is entitled to various damages: (1) $3,450,569 (the contract price minus the dollar value paid by Baby Blue); (2) $6,000,000 (the value of the inventory when it was purchased by Synnex minus the dollar value paid by Baby Blue); (3) out-of-pocket costs associated with the warehousing of equipment and settlement with Synnex; and (4) pre- and post-judgment interest.

120.   On the other hand, Northrop argues that KST is not entitled to damages, because Synnex held title of the inventory during the Corporate Award, and KST did not actually incur liability until February 2017, after the Corporate Award expired.  Northrop also argues that there is no evidence in support of its claim that the disputed inventory is worth $4,356,869.  Finally, Northrop points to the fact that KST only paid Synnex $3,252,777.60, minus the $906,300 Baby Blue paid KST.

121.   The Court **FINDS** that KST is entitled to $3,655,569 in damages, which includes (i) $3,450,569 in damages, (ii) $60,000 in storage fees associated with this inventory; and (iii) $145,000 in interest.  For (i), pursuant to Section 6.4, in the event of a termination by convenience, KST is entitled to the "contract value" of the inventory at issue.  KST is ***not*** entitled to the higher value of the inventory when it was purchased by Synnex, but it is entitled to the contract value of the disputed inventory, $4,356,869.00, as testified to by KST officials and indicated in the exhibits, minus the $906,300 that KST ultimately obtained from the selling the units to Baby Blue. (Exs. 28, 110, 244, 304).

122.   As for (ii), Mr. Tan testified there were also storage fees associated with this inventory of roughly $60,000.  (Exs. 222-228).  As for (iii), Mr. Tan testified that KST also had to pay interest of more than $145,000.

123.   Accordingly, the Court **FINDS** that KST has established the existence of the contract; its performance of the contract; Northrop's unexcused breach of the contract; and its damages.

124.   The total damages are $3,655,569.

///

///

-22-

## II. CONCLUSIONS OF LAW

### A.    Relevant Legal Principles

1.    To prevail on a breach of contract claim, a plaintiff must establish: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach of either express or implied terms of the contract, and (4) damage to plaintiff. *Abdelhamid v. Fire Ins. Exchange*, 182 Cal. App. 4th 990, 999, 106 Cal. Rptr. 3d 26 (2010).

2.    However, "[t]he law sensibly recognizes that although every instance of noncompliance with a contract's terms constitutes a breach, not every breach justifies treating the contract as terminated." *GoDigital, Inc. v. Contentbridge Sys., LLC*, No. LACV1707066JAKAFMX, 2018 WL 1918731, at *4 (C.D. Cal. Mar. 23, 2018) (quoting *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 195 Cal. App. 3d 1032, 1051, 241. Cal. Rptr. 487 (1987)). Indeed, "only '[w]hen a party's failure to perform a contractual obligation constitutes a material breach of the contract, [is] the other party ... discharged from its duty to perform under the contract.'" *Id*. (quoting *Brown v. Grimes*, 192 Cal. App. 4th 265, 277, 120 Cal. Rptr. 3d 893 (2011)).

3.    "Whether a partial breach of a contract is material depends on 'the importance or seriousness thereof and the probability of the injured party getting substantial performance.'" *Grimes*, 192 Cal. App. 4th at 278 (quoting 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 852, pp. 938–940).

4.    Additionally, "[e]very contract imposes upon each party a duty [or covenant] of good faith and fair dealing in its performance and its enforcement." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683, 254 Cal. Rptr. 211 (1988) (affirming dismissal of an employee's claim for relief alleging a tortious breach of the implied covenant of good faith and fair dealing). "There are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th

263, 278, 37 Cal. Rptr. 3d 434 (2005) (holding that the insured could not state a claim for breach of the implied covenant without showing the withholding of a benefit that was in fact due under the contract).

5.      However, a claim for "breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself." *IV Sols., Inc. v. Connecticut Gen. Life Ins. Co.*, No. CV 13-9026-GW(AJWX), 2015 WL 12843822, at *10 (C.D. Cal. Jan. 29, 2015).  "[If] the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous[.]."  *Id.* (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1394-95, 272 Cal. Rptr. 387 (1990)).

6.      Pursuant to California law, fact finders are "not prohibited from interpreting contracts.  Interpretation of a written instrument becomes solely a judicial function only when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or when a determination was made based on incompetent evidence."  *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395, 75 Cal. Rptr. 3d 333 (2008) (citing *Parsons v. Bristol Development Co.*, (1965) 62 Cal. 2d 861, 865, 44 Cal. Rptr. 767 (1965)).  But, when "ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact."  *Id.*; *see also* 1 B.E. Witkin, *Summary of California Law*, Contracts § 764 (11th ed. 2020) ("Interpretation of a written instrument is solely a judicial function unless interpretation turns on the credibility of extrinsic evidence," because "where the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence").  In the Court's view, interpreting this contract is an issue of fact because of the nature of the extrinsic evidence, but the Court would interpret this contract the same way as a matter of law in the absence of extrinsic evidence.

### B.   Northrop's Affirmative Defenses

7.     Northrop asserts four affirmative defenses: (a) estoppel; (b) unclean hands; (c) justification; and (d) KST's failure to mitigate damages.

#### a.   *Estoppel*

8.     "The traditional elements of equitable estoppel are that: (1) the party to be estopped knows the facts, (2) he or she intends that his or her conduct will be acted on or must so act that the party invoking estoppel has a right to believe it is so intended, (3) the party invoking estoppel must be ignorant of the true facts, and (4) he or she must detrimentally rely on the former's conduct." *United States v. Hemmen*, 51 F.3d 883, 892 (9th Cir. 1995).

9.     Northrop argues that this defense bars KST's claims because (1) KST knew that it did not hold title to the inventory at issue; (2) Northrop did not know that Synnex held title to the inventory at issue; and (3) Northrop relied on KST's misrepresentations to its detriment.

10.     The Court **CONCLUDES** that Northrop did not rely on KST's representations to its ***detriment***, and accordingly estoppel does not apply.  As discussed above, the Court **FINDS** that KST's use of Synnex was not a material breach of the Corporate Award, and therefore the Court does not agree with Northrop that the title of the inventory prior to delivery was crucial.  Instead, the weight of the evidence indicated that the title of the inventory prior to delivery was immaterial.  Accordingly, there was no detrimental reliance, and no estoppel.

#### b.   *Unclean Hands*

11.     "To prevail on a defense of unclean hands, a defendant must demonstrate by clear and convincing evidence (1) 'that the plaintiff's conduct is inequitable;' and (2) 'that the conduct relates to the subject matter of [the plaintiff's] claims.'"  *POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1092 (C.D. Cal. 2016) (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987)).  "With respect to the first requirement, '[o]nly a showing of wrongfulness, willfulness, bad faith, or gross

negligence, proved by clear and convincing evidence, will establish sufficient culpability for invocation of the doctrine of unclean hands.'"  *Id.* (quoting *Pfizer, Inc. v. Int'l Rectifier Corp.*, 685 F.2d 357, 359 (9th Cir.1982)).

12.     Additionally, "[e]ven if a defendant satisfies both prongs, however, courts must not automatically apply the doctrine of unclean hands and 'permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law.'"  *Id.* (quoting *Johnson v. Yellow Cab Transit Co.,* 321 U.S. 383, 387 (1944)).  "Rather, determining whether the doctrine of unclean hands precludes relief requires balancing the alleged wrongdoing of the plaintiff against that of the defendant, and weigh[ing] the substance of the right asserted by [the] plaintiff against the transgression which, it is contended, serves to foreclose that right."  *Id.* (citing *Northbay Wellness Grp., Inc.*, 789 F.3d 956, 960 (9th Cir.2015)).

13.     Northrop argues that KST's recovery is barred under the unclean hands doctrine because of KST repeatedly misrepresenting and/or concealing the facts and circumstances regarding the Suspension, and failing to share with Northrop material facts regarding the government's allegations against KST.  Northrop also points to KST's statement that it was a "presently responsible" contractor, knowing that the representation would be important to Northrop, to induce Northrop to place orders with KST.

14.     Northrop also argues that KST's mischaracterizations regarding its relationship with Synnex is a further basis to bar Plaintiff's claims.

15.     While the Court did **FIND** that some of KST's communications with Northrop regarding the Suspension and Synnex were misleading, the Court **CONCLUDES** that the unclean hands doctrine does not bar KST's claims.  This conclusion is based on the Court's determination that KST's actions do ***not*** rise to the level required for the unclean hands doctrine to apply.

16.     Specifically, KST's wrongdoing should not foreclose its right to recover pursuant to Section 6.4.  Northrop would not have acted any differently had KST been ***completely*** forthright regarding its Suspension; KST's Suspension did not justify a

-26-

termination for cause, and Northrop would have not placed orders with KST, just like it did.  Additionally, while KST may not have been *completely* forthright with Northrop regarding both the Suspension and Synnex, it did disclose both the existence of the Suspension and some of its relationship with Synnex to Northrop.  And as stated above, the Court **FINDS** that KST's use of Synnex was not a material breach of the Corporate Award.

17.    Accordingly, the weight of the evidence does not support the application of the unclean hand doctrine to bar KST's claims.

### c.    *Justification*

18.    Northrop next argues that the conduct that KST suggests breached the Corporate Award was justified.  Specifically, Northrop argues that it had no obligation to purchase inventory based on forecasts it submitted to KST, which were non-binding.  Northrop further argues that because the Corporate Award clearly vested sole discretion in Northrop to place orders with KST without a minimum purchasing requirement, its decision to stop placing orders with KST was contractually permissible.

19.    Northrop also argues that KST's Suspension further justified Northrop's decision to pause.

20.    The Court **CONCLUDES** that the defense of justification does not bar KST's claims.  As discussed above, the Court **FINDS** that Northrop breached the Corporate Award with respect to Section 6.4.  Specifically, while Northrop argues that under the Corporate Award it had no obligation to purchase inventory contained in the forecasts, that ignores Section 6.4's requirements, which state that in the event of a termination for convivence, Northrop was obligated to purchase forecasted inventory, up to 4500 units.  Northrop cannot read Section 6.4 out of the contract, especially considering the weight of the evidence, which demonstrated the importance of Section 6.4 to KST.

21.    As for the Suspension, as discussed above, the Suspension does not justify Northrop ignoring Section 6.4's requirements.

///

### d. *Failure to Mitigate Damages*

22.     "The doctrine of mitigation of damages holds that '[a] plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided.'" *Valle de Oro Bank v. Gamboa*, 26 Cal. App. 4th 1686, 1691, 32 Cal. Rptr. 2d 329 (1994) (quoting *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41, 21 Cal. Rptr. 2d 110 (1993)).   "A plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion." *Id.*

23.     Northrop argues that KST failed to mitigate its damages, as it unreasonably delayed re-selling the inventory at issue to other customers.   Northrop further argues that KST's failure to disclose Synnex as the actual owner of the inventory at issue is additional evidence of its failure to mitigate.   Finally, Northrop argues that KST's financial commitment to Synnex regarding the disputed inventory, which is inconsistent with the Corporate Award, is a further failure of KST to mitigate.

24.     The Court **CONCLUDES** that KST properly mitigated its damages. Specifically, Mr. Tan testified that KST considered several offers for the disputed inventory, before eventually selling the inventory to Big Blue for $906,300.   KST witnesses also testified that the inventory was configured for Northrop, which made selling the inventory more difficult.

25.     The Court also notes that Northrop's arguments regarding KST's delay in selling the disputed inventory are not well taken, considering the weight of the evidence which suggests that Northrop was less than forthcoming with KST regarding whether it was going to purchase the disputed inventory.   For example, Exhibit 159 is an email from Mr. Ferguson to Mr. Tan, dated November 25, 2015, which stated that Mr. Brown was "pursuing" getting KST all clear when Mr. Brown was doing no such thing.   In fact, Northrop did not officially inform KST that it would not be purchasing the forecasted inventory until June 2016 (Ex. 229).   Accordingly, Northrop can hardly fault KST for any "delay."

26.     The Court also determines that KST's financial commitment to Synnex does not constitute a failure to mitigate damages; KST was utilizing its normal process to procure the inventory needed to satisfy Northrop's forecasts.  Again, had Northrop been forthright with KST regarding its status, KST may have been able to act sooner.

27.     Given the circumstances, the Court **CONCLUDES** that KST exercised ordinary care and used reasonable exertion to mitigate its damages.

### C.     <u>Implied Covenant of Good Faith and Fair Dealing</u>

28.     The Court determines that Northrop breached the Corporate Award with KST, as stated above.  Accordingly, for the same reasons, the Court **CONCLUDES** Northrop is liable to KST on KST's claim for breach of the implied covenant of good faith and fair dealing.

29.     However, the Court also **CONCLUDES** that KST is not entitled to additional damages for this claim.  KST's factual predicate for this claim is identical to its claim for breach of contract; namely that Northrop acted improperly when it stopped ordering inventory from KST after the Suspension and failed to make KST whole pursuant to Section 6.4.  Accordingly, KST is not entitled to additional damages other than those pursuant to Section 6.4.  *See Careau*, 222 Cal. App. at 1394-95.

## III.     <u>VERDICT</u>

The Court returns the following verdict:

On KST's claims for breach of contract and the implied covenant of good faith and fair dealing, in favor of KST and against Northrop.  Damages are $3,655,569.

The Court will enter a separate judgment pursuant to Rules 54 and 58(b) of the Federal Rules of Civil Procedure.

Dated:  June 10, 2020

_____
MICHAEL W. FITZGERALD
United States District Judge